[Cite as *In re L.L.*, 2024-Ohio-5219.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

IN RE:                                              :

           L.L.,                                   :

                            Case No. 24CA10

                                      :

    An Adjudicated

                         Dependent Child.          :
                         DECISION AND JUDGMENT
                         ENTRY

                         :

---

APPEARANCES:

Christopher Bazeley, Cincinnati, Ohio, for appellant.[1]

Keith Brewster, Pickaway County Assistant Prosecuting Attorney, Circleville, Ohio, for appellee.

---

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:10-23-24
ABELE, J.

    **{¶1}** This is an appeal from a Pickaway County Common Pleas Court, Juvenile Division, judgment that granted Pickaway County Job and Family Services, appellee herein, permanent custody of five-year-old L.L.

---

[1] Different counsel represented appellant during the trial court proceedings.

Appellant N.L., the child's biological father, raises the following assignment of error:

> "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED [THE GRANDMOTHER]'S MOTION FOR LEGAL CUSTODY."

{¶2} The family has a lengthy history with appellee.[2] In 2018, the child (then, a newborn) tested positive for drugs. As a result, the trial court adjudicated the child an abused child and placed him in the temporary custody of the child's maternal grandmother. The child eventually was reunified with his mother, and, on June 1, 2020, the court terminated the case.

{¶3} In 2022, appellee filed a new complaint that involved the child. The court adjudicated the child an abused child as a result of testing positive for fentanyl. The child had ingested fentanyl while home with his parents and presented to the emergency room for treatment. After the child's release from the hospital, the court placed him in the maternal grandmother's temporary custody. Shortly thereafter, grandmother attempted suicide while the child was in her care. The trial court subsequently removed the child from grandmother's temporary custody and placed him in another family member's temporary custody.

---

[2] We have gathered the underlying facts from the trial court's "memorandum decision."

{¶4} On July 21, 2022, the trial court removed the child from the relative's temporary custody and placed the child in appellee's temporary custody. Appellee later dismissed the case due to "the approaching sunset date."[3] The child nonetheless remained in appellee's temporary custody and, on October 13, 2023, appellee filed the complaint that gave rise to the instant appeal. This complaint alleged that the child is a dependent child and stated that (1) the child's parents pleaded guilty to involuntary manslaughter that involved the child's sibling, and (2) the parents are incarcerated until January 2041. Appellee asked the court to place the child in its temporary custody.

{¶5} On October 24, 2023, appellee filed a permanent custody motion and asserted that the child has been in its temporary custody for 12 or more months of a consecutive 22-month period and that placing the child in its permanent custody is in the child's best interest.

{¶6} On November 21, 2023, the trial court continued the child in appellee's temporary custody pending further hearing. Later, the court adjudicated the child a dependent child and continued the child in appellee's temporary custody.

{¶7} On January 24 and 25, 2024, the trial court held a hearing to consider appellee's permanent custody motion. At the

---

[3] The record transmitted on appeal does not contain any filings from the previous cases.

hearing, appellee presented evidence to establish that in 2018, the maternal grandmother had temporary custody of the child, but "failed to follow court orders on companionship time between" the parents and the child and allowed the parents to have contact with the child outside of the supervised visitations.

{¶8} In 2021, appellee filed a new case that involved the child due to allegations of drug activity.  Although the child and his sibling were placed in the maternal grandmother's temporary custody, grandmother wanted the children to be returned to the parents' custody or to allow the parents to have expanded visits with the children.  Appellee, however, still awaited drug screen results, had concerns that the grandmother failed to follow court orders, and pressed appellee to return the children to the parents' care, even though appellee had "ongoing concerns of the parents' drug use."

{¶9} On January 16, 2022, while the children were in their parents' care, appellee received a referral that the child's sibling "was brought to the hospital and was unresponsive."  The child who is the subject of this appeal, L.L., also was brought to the hospital and "was sick and vomiting."  Medical personnel expressed concerns that the children had ingested "something" and asked a caseworker to respond to the hospital.  The child's sibling subsequently "died as a result of ingesting fentanyl," and law enforcement arrested the parents.  L.L. was placed in

the grandmother's temporary custody.

{¶10} Less than two months later, appellee received a referral that grandmother had attempted suicide while the child was in the home.  The trial court subsequently placed the child in appellee's temporary custody, and appellee later placed the child in another family member's temporary custody.

{¶11} The grandmother continued to contact appellee and expressed her frustration.  She also drove to the home where the child had been placed and "honk[ed] her horn outside the home" in an attempt to make contact, even though grandmother knew the court had issued an order that prohibited her from having contact with the child.

{¶12} The trial court later removed the child from the relative's home.  This relative allowed the grandmother and grandfather to babysit the child, even though all parties knew that the court had issued an order that prohibited contact between the child and the grandparents.  The court thus placed the child in appellee's temporary custody.

{¶13} The child has been in his current foster home since June 23, 2023.  The child "is doing well in the home.  He is engaged in counseling and is in preschool."  The child "is showing more empathy with others" and his "manners are improving."  The child has stated that he would like to continue living with the foster family.

{¶14} The child's current caseworker indicated that the child needs permanency and stability and that the current foster home "is the best option to provide permanency and to advocate" for the child.

{¶15} The child's counselor stated that placing the child in appellee's permanent custody will serve his best interest. The counselor testified that granting the grandmother legal custody is not in the child's best interest, "in part because removing the child from the [foster family's] home and placing [him] with [the grandmother] would be additional trauma." Moreover, the grandmother "lacks awareness of [the child's] complex needs." The counselor explained that the child needs "stability and predictability."

{¶16} The child's guardian ad litem (GAL) recommended that the trial court place the child in appellee's permanent custody. The GAL stated that the child "has suffered many traumas during his short life." The foster home provides the child with stability and structure, and the foster parents care for the child's emotional, medical, and psychological needs.

{¶17} On May 16, 2024, the trial court granted appellee permanent custody of the child. The court found that the child has been in appellee's temporary custody for 12 or more months of a consecutive 22-month period and that placing the child in appellee's permanent custody is in his best interest.

{¶18} With respect to the child's interactions and interrelationships, the court found that the child has not had any "meaningful contact with his parents since" January 2022. The court noted that the parents have been incarcerated since January 2022. The child has not had any contact with the maternal grandmother since July 2022. The child "has a strong bond with his foster family" and with his sisters. The foster mother stated that she and her husband would like to adopt the child if appellee receives permanent custody of the child.

{¶19} Regarding the child's wishes, the court stated that the GAL recommended that the court grant appellee permanent custody of the child. The court further noted that the child "has indicated a desire to remain with" the foster family.

{¶20} The trial court considered the child's custodial history and noted that the child has been in appellee's temporary custody since July 2022. During the first two years of his life, the child was in the maternal grandmother's temporary custody. He then returned to his parents. The child was placed with his grandmother from January 16, 2022, through March 8, 2022, and with another family member from March 21, 2022, through July 21, 2022. The child has been in the current foster home for approximately six months.

{¶21} The trial court found that the child needs a legally secure permanent placement and that he cannot achieve that type

of placement without granting appellee permanent custody.  The court observed that both parents are incarcerated and will remain incarcerated until the child is over the age of majority. The court further found that no relative placement options are viable.  The court stated that the maternal grandmother cannot provide the child with a legally secure permanent placement due to her inability to "handle [the child's] special needs."  The court found that the grandmother's "abilities are questionable" and indicated that "[h]istorically, she had not been able to provide the support that [the child] requires."  The court additionally noted that "[b]efore Grandmother could be considered for legal custody, [the child] would require one to seven months of counseling, at a minimum."

{¶22} Based upon the foregoing reasons, the trial court determined that placing the child in appellee's permanent custody would be in his best interest and granted appellee's permanent custody motion.  This appeal followed.

{¶23} In his sole assignment of error, appellant asserts that the trial court abused its discretion by denying the grandmother's legal custody motion.


                                    A

{¶24} We initially note that "[a] parent has no standing to assert that the court abused its discretion by failing to give

[a third party] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper." *In re Pittman*, 2002-Ohio-2208, ¶ 70 (9th Dist.); *accord In re A.C.*, 2023-Ohio-3072, ¶¶ 56-57 (5th Dist.); *In re O.D.-L.*, 2021-Ohio-79, ¶ 20 (2d Dist.); *In re L.W.*, 2017-Ohio-657, ¶ 23 (8th Dist.); *In re S.G.*, 2016-Ohio-8403, ¶ 52 (3d Dist.). *But see In re R.M.S.*, 2019-Ohio-4281, ¶ 24 (1st Dist.), quoting *In re K.C.*, 2017-Ohio-8383, ¶ 12 (1st Dist.) (a father's "assertion of an effect on his residual parenting rights does not confer standing, as 'the assertion of injury to a parent's residual parenting rights cannot be redressed where the requested relief is to award custody to a relative who did not appeal the denial of her or his custody petition'"). We further observe that "[i]f permanent custody is in the child's best interest, legal custody or placement with [a parent or third party] necessarily is not." *In re K.M.*, 2014-Ohio-4268, ¶ 9 (9th Dist.). Therefore, we evaluate appellant's assignment of error by considering whether permanent custody is in the child's best interest. *In re C.M.*, 2017-Ohio-9037, ¶ 70 (4th Dist.); *see In re Hiatt*, 86 Ohio App.3d 716, 722 (4th Dist.1993) ("appellant has standing to assert on appeal that the trial court erred in not granting legal custody to one of his relatives rather than permanent custody, since he was prejudiced to the extent that it affected his residual parental rights").

B

**{¶25}** Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.*, 2014-Ohio-3178, ¶ 27 (4th Dist.); *In re R.S.*, 2013-Ohio-5569, ¶ 29 (4th Dist.); *accord In re Z.C.*, 2023-Ohio-4703, ¶ 1.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.  It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

**{¶26}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103,

115 (9th Dist. 2001), quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord In re Pittman*, 2002-Ohio-2208, ¶ 23-24 (9th Dist.). We further observe, however, that issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

{¶27} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-3146, ¶ 7 (4th Dist.).

{¶28} The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-43 (1986); *compare In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986) (whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence").

{¶29} Thus, if a children services agency presented competent and credible evidence upon which the trier of fact

reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, ¶ 62 (4th Dist.); *In re R.L.*, 2012-Ohio-6049, ¶ 17 (2d Dist.), quoting *In re A.U.*, 2008-Ohio-187, ¶ 9 (2d Dist.) ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.'").

{¶30} Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175. A reviewing court should find a trial court's permanent custody judgment against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [judgment].'" *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000); *see Black's Law Dictionary* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential

standard of review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence").

C

**{¶31}** We certainly recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.'" *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *accord In re Hayes*, 79 Ohio St.3d 46, 48 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("natural parents have a fundamental right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

**{¶32}** A parent's rights, however, are not absolute. *In re D.A.*, 2007-Ohio-1105, ¶ 11. Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59

Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974).  Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

**{¶33}** Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing.  The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency.  *Id.*  Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151:  "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C. 2151.01(A).

D

**{¶34}** R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:

(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶35} Thus, before a trial court may award a children services agency permanent custody, it must find, by clear and convincing evidence, (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interest.

1

{¶36} In the case at bar, the trial court found that the child has been in appellee's temporary custody for more than 12 months of a consecutive 22-month period and, thus, that R.C. 2151.414(B)(1)(d) applies. Because appellant does not challenge this finding, we do not address it.

2

{¶37} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶38} Courts that are determining whether a grant of permanent custody to a children services agency will promote a child's best interest must consider "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *C.F.*, 2007-Ohio-1104, at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297, ¶ 19 (10th Dist.). However, none of the best interest factors is entitled to

"greater weight or heightened significance." *C.F.* at ¶ 57.
Instead, the trial court considers the totality of the
circumstances when making its best interest determination. *In
re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-
Ohio-4918, ¶ 46 (9th Dist.). In general, "[a] child's best
interest is served by placing the child in a permanent situation
that fosters growth, stability, and security." *In re C.B.C.*,
2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of
Ridenour*, 61 Ohio St.3d 319, 324 (1991).


### Child's Interactions and Interrelationships

**{¶39}** The child's parents are incarcerated, and the child
has not had any interaction with the parents since the beginning
of 2022.

**{¶40}** The child did not have a positive experience while in
the grandmother's temporary custody. The grandmother attempted
suicide while the child was in her care, and as a result, the
trial court removed the child from her temporary custody. The
grandmother thus did not provide the child with a healthy
environment in which the child could thrive.

**{¶41}** The evidence shows that the child is thriving in the
foster home and that the foster parents provide the child with
all of his needs. The foster family provides the child with
positive interactions and interrelationships.

Child's Wishes

**{¶42}** The GAL recommended that the court place the child in appellee's permanent custody. *C.F.,* 2007-Ohio-1104, at ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 2014-Ohio-2961, ¶ 32 (4th Dist.) (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as the child directly expresses or through the GAL). Additionally, the child expressed a desire to remain with the foster family.

Custodial History

**{¶43}** The trial court found that the child has been in appellee's temporary custody since July 2022.[4] When appellee filed its permanent custody motion, the child had been in its temporary custody for more than 12 months of a consecutive 22-month period.

Legally Secure Permanent Placement

**{¶44}** "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe,

---

[4] We note that the trial court based this finding upon a previous case involving the family that apparently had been dismissed. None of the documents from that previous case are included in the record, however. We further note that appellant does not dispute that the child has been in appellee's temporary custody for more than 12 months of a consecutive 22-month period.

stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) ("legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (legally secure permanent placement requires more than a stable home and income, but also requires an environment that will provide for child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (mother was unable to provide legally secure permanent placement when she lacked physical and emotional stability and father was unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (legally secure permanent placement means "a placement that is stable and consistent"); *Black's Law Dictionary* (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in

safety with one or more dependable adults who will provide for the child's needs." *M.B.*, 2016-Ohio-793, at ¶ 56 (4th Dist.).

**{¶45}** In the case at bar, the evidence shows that the child needs a legally secure permanent placement and that the child cannot achieve this type of placement without granting appellee permanent custody. Appellant and the child's mother are incarcerated until 2041 and were convicted of offenses that related to the death of the child's sibling after the sibling ingested a fatal amount of fentanyl. The child involved in this appeal also ingested fentanyl, but fortunately recovered. Here, neither parent has any ability to provide the child with a legally secure permanent placement.

**{¶46}** The evidence further shows that the child otherwise lacks a legally secure permanent placement. Although the child's grandmother requested legal custody of the child, the trial court did not conclude that her home would be a legally secure permanent placement for the child.

**{¶47}** We also observe that a trial court that is evaluating a child's best interest need not determine that no suitable person is available for placement. *Schaefer, supra*, ¶ 64. Moreover, courts are not required to favor relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Id.; accord In re T.G.*, 2015-Ohio-5330, ¶ 24 (4th Dist.); *see In re*

*V.C.*, 2015-Ohio-4991, ¶ 61 (8th Dist.) (stating that relative's positive relationship with child and willingness to provide an appropriate home did not trump child's best interest). Additionally, "[r]elatives seeking the placement of the child are not afforded the same presumptive rights that a natural parent receives as a matter of law, and the willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody." *In re Keaton*, 4th Dist. Ross No. 04CA2785, 2004-Ohio-6210, 2004 WL 2650249, ¶ 61. We again observe that "[i]f permanent custody is in the child's best interest, legal custody or placement with [a parent or other relative] necessarily is not." *K.M.*, 2014-Ohio-4268, at ¶ 9 (9th Dist.).

{¶48} Furthermore, we recognize that although "[f]amily unity and blood relationship" may be "vital factors" to consider, neither is controlling. *In re J.B.*, 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013-Ohio-1703, ¶ 31. Indeed, "neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term . . . and their best interest is the pivotal factor in permanency case." *In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 35. Thus, while biological relationships may constitute important considerations, they do not control when ascertaining a child's best interest. *In re J.B.*, 8th Dist. Cuyahoga Nos. 98518 and

98519, 2013-Ohio-1706, ¶ 111.  Consequently, "courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody."  *Keaton*, 2004-Ohio-6210, ¶ 61 (4th Dist.).

**{¶49}** In the case sub judice, after our review we believe that ample, clear and convincing evidence shows that placing the child in appellee's permanent custody will provide the child with a stable, secure, nurturing, and permanent home.  The child is doing well in the foster home, and the foster parents plan to adopt the child if the court places the child in appellee's permanent custody.  The previous upheavals in the child's custodial status exacerbated the trauma that the child suffered as a result of his sibling's death.  Thus, the trial court could have formed a firm belief that placing the child in appellee's permanent custody will serve his best interest.

**{¶50}** Accordingly, based upon the foregoing reasons, we overrule appellant's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

                          JUDGMENT ENTRY

It is ordered that the appeal be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

                                        For the Court

    BY:_____
                                        Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.